Matter of Roberts v City of New York (2003 NY Slip Op 23984)

Matter of Roberts v City of New York

2003 NY Slip Op 23984 [3 Misc 3d 549]

January 29, 2003

Supreme Court, New York County,

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Friday, July 9, 2004

[*1]
In the Matter of Lillian Roberts, as Executive Director of District Council 37, American Federation of State, County and Municipal Employees, AFL-CIO, et al., Petitioners,
v
City of New York et al., Respondents.
Supreme Court, New York County, January 29, 2003

APPEARANCES OF COUNSEL

Belson, Campbell & Szuflita (Leonard Shrier of counsel), and Joel Giller (Robin Roach of counsel), for petitioners. Michael A. Cardozo, Corporation Counsel, New York City (Celine Mayo of counsel), for respondents.

{**3 Misc 3d at 550} OPINION OF THE COURT

Lewis Bart Stone, J. 
These two proceedings commenced separately under article 78 of the Civil Practice Law and Rules were brought by various officers and members of District Council 37, American Federation of State, County and Municipal Employees, AFL-CIO (collectively DC-37) against the City of New York, its Department of Education (DOE) and other related municipal officials and agencies to challenge certain personnel decisions of the City and DOE which have resulted in layoffs and other changes which DC-{**3 Misc 3d at 551}37 claims are adverse to their interests. The first proceeding, index No. 127943/02, hereafter referred to as Roberts I, was commenced by order to show cause, issued by the Honorable Lucinda Suarez, on December 31, 2002, to challenge the layoff or termination (hereafter, the separation) of about 303 provisional civil service employees of DOE (the employees). The second proceeding, index No. 103953/03, hereafter referred to as Roberts II, was commenced by order to show cause issued by the Honorable Emily Jane Goodman on or about March 5, 2003, relates to certain of the employees, but raises different issues to challenge their separation.
Although there is a significant overlap, the identities of the named petitioners and respondents in the two proceedings are not identical, as the issues raised seem to require the joinder of different parties. Petitioners and respondents in both cases are represented, respectively, by the same counsel and the underlying City action, the separation of the DOE employees, is essentially the same. In neither case has either side moved to consolidate. However, as a matter of efficiency, counsel have agreed with the court that it would be appropriate and in the interests of judicial economy to consider and decide all claims asserted in the two proceedings together.
The parties, by their agreement, have adjourned both proceedings from time to time and have agreed to a briefing schedule resulting in the final submission of these proceedings to this court on December 12, 2003, at which time the parties also made oral statements on the record.

The Parties

In Roberts I, the petitioners are the executive directors of DC-37, the presidents of various locals of DC-37, which locals collectively represent the employees, as well as one of the employees. [*2]In Roberts II, the petitioners are the same union officers (except that Veronica Montgomery-Costa, a petitioner in Roberts I, is not a petitioner in Roberts II) and several of the employees, one of whom is also a petitioner in Roberts I. While Roberts I is brought on behalf of the named petitioners, Roberts II is also brought by the individual employees on behalf of others similarly situated.
Both Roberts I and Roberts II name as respondents the City, the Mayor, the Department of Education, and the Chancellor of the Department of Education. Roberts I also names the City Department of Social Services/Human Resources and its Commissioner,{**3 Misc 3d at 552} while Roberts II also names the City Department of Citywide Administrative Services and its Commissioner.
Cutting through the technicalities, the proceedings are both before the court to resolve the dispute between the City and its agencies, on the one hand, and certain separated employees and DC-37 on the other hand as to the legality of the separations.
Also in dispute is what relief would be appropriate if the City was found to have acted improperly. Thus, as each side is fully aligned in its assertions and interests, this court will refer to the petitioners as DC-37 and the respondents as the City, for ease of reference.
The Facts

At the end of calendar year 2002, approximately 303 provisional clerical employees of DOE who were represented by DC-37[FN1]

were separated from service. Some of these employees were in the competitive class and some were not.
Pursuant to the agreement between DC-37 and the City (the union contract), which covered DOE clerical employees, the City gave notice to DC-37 on November 21, 2002 of the separation of certain named employees, effective January 2, 2003, giving their respective titles and certain other information for each. On December 4, 2002, DC-37 advised the City that the November 21 notice did not comply with the applicable notice provisions of the union contract relating to the separation of employees, in that Social Security numbers, title codes, title start dates and City start dates were missing and asserted that the notice was a nullity. The City, on the same day, December 4, 2002, sent DC-37 additional information on the separations, listing three more employees to be separated, and advising that as the identity of these three additional employees were not disclosed in the earlier notice, such three would be separated, effective January 8, 2003. On December 6, 2002, the City advised DC-37 that it was treating DC-37's advice of December 4 as a request for information, and supplied DC-37 with the missing Social Security numbers, title codes, title start dates and City start dates for all 303 employees.
On December 10, 2002, representatives of DC-37 met with representatives of the City further to protest the separations. At that {**3 Misc 3d at 553}meeting DC-37, inter alia, objected specifically to the alleged failure of the City to comply with the procedures of the New York Layoff Procedural Manual for Agencies (the Manual), and presented a white paper which proposed that the City retain the separated workers by replacing certain consultants already hired and in the process of being hired.
On December 26, 2002, DC-37 further advised DOE that it believed there were 212 "WEP" (Work Employment Program) welfare recipients performing clerical duties in DOE and that their presence, under the "anti-displacement provision of the Social Services Law" prevented the separations "when WEP workers are assigned clerical functions."

Proceedings

In Roberts I, the order to show cause temporarily restrained the City from effectuating the separations until the return date of the order, January 3, 2003. The petition sought an order to restrain DOE from proceeding with the separations on various grounds.
On January 3, 2003, the City cross-moved to dismiss Roberts I on the grounds that the court lacked subject matter jurisdiction, "in whole or in part," that the petition was nonjusticiable and that the petition failed to state a cause of action.
On January 3, 2003, the return date, after hearing arguments of counsel, the court determined that, where municipal separations are challenged, established law relating to preliminary injunctions allows both the separation and the litigation to proceed, with the understanding that success in litigation would result in reinstatement and back pay for those improperly separated.[FN2]

The principle that a preliminary injunction cannot be issued to bar a municipal layoff, which is well established, applies a fortiori to a temporary restraining order. The court thus dissolved the temporary restraining order and rejected DC-37's request for a preliminary injunction. The parties requested, and the court granted, adjournments for possible negotiations to {**3 Misc 3d at 554}resolve the dispute and if that failed, for the City to answer the petition.
During these adjournments, Roberts II was commenced by DC-37 against the City to reverse the separation of certain of the employees who had passed a competitive exam for their titles, on the grounds that DOE continued to employ provisional employees in such titles who had not passed such examinations. Such, DC-37 asserts, was irrational, arbitrary and capricious and contrary to law.
The City responded to Roberts II by cross-moving to dismiss the petition on the grounds that it failed to state a cause of action and was moot, or in the alternative, for leave to file answering papers. The assertion of mootness was based on the City's assertion that the remaining provisionals on the DOE payroll who had not passed the examinations were scheduled for separation shortly in a second round of reduction in forces. Apparently, following such second round, not all remaining provisional employees were separated, and accordingly, after the consent adjournments, the City has answered and issues on this proceeding, too, have been briefed and submitted to this court for determination.

[*3]
Issues Presented

DC-37 seeks declaratory relief that the separations were in violation of law, preliminary and permanent injunctions to forbid the illegal actions allegedly taken and a reversal of the separations with reinstatement with back pay and interest.
DC-37's objection to the separations (which DC-37 thus asserts entitled it to relief) falls into four distinct categories, viz.:
1. The City violated the procedures of the Layoff Manual in effectuating the separations.
2. The City separated the employees at the time WEP employees remained on the DOE payroll, and displaced regular employees with WEP employees who perform work ordinarily performed by regular employees.
3. The City has "contracted out services while laying off DOE Civil Service employees in the same comparable positions."
4. The City has separated provisional employees who have passed the civil service exam for positions (but have not been appointed) while continuing to employ others in provisional status who have not passed the exam.
The first three objections were raised in Roberts I, the fourth, in Roberts II.{**3 Misc 3d at 555}

Background

As a result of the confluence of the September 11, 2001 attack on the World Trade Center and a general national economic slowdown, the City found itself at the end of 2002 facing a massive budget gap, which it attempted to address by significant increases in taxes and reductions in expenditures. As payroll is the City's largest expense, the City acted to revise programs and reduce payrolls in a manner consistent with priorities set by the Mayor and the City's legal obligations under contracts and statutory requirements. Virtually each cutback of program and personnel was met with resistance and in many cases legal actions from both those affected by the change and by unions (such as DC-37) representing affected workers and asserting their own interests in response to a specter of fewer members and less dues. These two proceedings are examples of such responses and each seeks to reverse certain City actions at DOE which were part of the City's response to its budget woes. That DC-37 was aware of the extraordinary situation is illustrated by their efforts to suggest alternate methods of cost containment in the white paper. These proceedings attack the City's action to separate the employees to reduce its payroll on various grounds and claim both that the City had used incorrect procedures in separating them and that because of other acts or failures to act, the City had no right to separate them. Because of the multiple layers of law which encrusts the hiring and firing of municipal workers, the courts and not the City must now decide whether the separations were, as the City contends, proper, or whether they were, as DC-37 contends, improper.

The Layoff Manual

DC-37 contends in Roberts I that the City improperly separated the employees by failing to adhere to the Layoff Manual. To uphold this claim requires the court to resolve a series of issues. The first issue is whether the Layoff Manual creates rights which inure to the benefit of city employees or their unions. If so, the second issue is whether in fact there had been a failure by the City to adhere to its Layoff Manual. If so, a third step is whether remedies are available to those [*4]whose separation was affected by such failure of their unions. If so, a fourth step is what such remedies might be. Because this court has concluded that the Layoff Manual creates no rights which inure to the benefit of city employees or their unions, the court's analysis stops at the first step and the remainder of the steps need and will not be addressed by the court.{**3 Misc 3d at 556}
The court reaches its conclusion on the issue by considering both the function of the Layoff Manual and case law, as no statute requires the City to prepare or maintain such Manual.
DC-37 contends that "Layoff procedures in the DOE are governed by the Layoff Manual." (Emphasis added.) DC-37 in effect asserts that the Layoff Manual creates terms of employment thereby giving employees rights thereunder. No authority is cited for this contention. The City, in response, calls the Layoff Manual an "internal guide for agencies engaged in the Layoff process . . . not intended for use by any person outside of the City" and also cites no authority on this issue.
The characterization of the Layoff Manual by the parties is designed by them as advocates to advance their basic contentions: DC-37, that the Layoff Manual binds the City and creates rights, and the City, that it does not. It is therefore necessary to proceed beyond semantics to resolve this issue. As this issue is one of first impression, this court must analyze the source and functions of the Layoff Manual to determine which party's view prevails.
Employees' rights are legal or contractual. Stated employee policies or employee manuals given to workers in the private sector at the time of employment have often been elevated to a contractual level to determine an employee's rights on grounds that the employee accepted the terms by agreeing to be employed. Thus, the concept advanced by DC-37 that stated policies may affect terms of employment may not be dismissed offhand. However, a further analysis of the actual structure of City employment makes this concept inapplicable to this dispute. The terms of City employees' employment are, as DC-37 otherwise makes clear in its papers, highly regulated by the law, both state and federal and by the State Constitution as well as by various union agreements. In this case, DC-37 cites various provisions of both consolidated and unconsolidated law to make its points most of which do not apply to private sector employment, where courts must look to other sources to resolve disputes over the terms of an employee's employment. Further, in the public sector, where regulations have the force of law, the process of enacting regulations is closely itself regulated so that persons affected by a regulation may only be so affected where the regulation is authorized by law and adopted by proper procedure. To the extent a valid regulation would affect or protect an employee's rights, it would be part of the matrix of law setting the terms of that employee's employment, or as in this case, such employee's separation from employment.{**3 Misc 3d at 557}
In addition, the employment of city employees is subject to collective negotiation rights embedded in state law. In fact, the employees were members of a bargaining unit represented by DC-37, and, as a result, their employment and termination is covered by the union contract. The union contract, entered into under the authority of state law, to the extent it does not violate state law, also creates terms of employment for covered employees, such as the employees. For example, the union contract expressly sets forth certain notice requirements for the separation of employees.
Thus, the rules regulating the terms of employment of municipal employees are complex and are derived from a wide source of applicable law and contracts. As the two instant proceedings make clear, making changes under this multi-rule scheme is not easy, and changes made without dotting every "i" and crossing every "t" can easily result in extensive litigation, which, if appeals are taken, may last years.
[*5]
The Layoff Manual was clearly prepared with this background in mind. It is a "how-to" manual, prepared for city managers to enable them to separate employees in a manner consistent with the requirements of law from all sources and contractual rights (which would include in this case the union contract). Because of the complexity of the process, creating the Layoff Manual allows the City to separate employees without researching the law and rules relating to each employee separated in each instance.
The Layoff Manual is therefore not a term of employment given to employees when they become employed; it is meant to be and is an internal document, no different than a memorandum of counsel to a manager as to how to effect an employee's separation. It is not a regulation as it has not been authorized as such by law and the record shows no indication that it has gone through the process necessary to enact a regulation. Moreover, the issue presented here, the notice period, is expressly covered by the union contract. Thus, to the extent the Layoff Manual creates a "contractual" notice period, it would also violate basic policies of collective negotiation, which restrict the City from unilaterally changing the term of a union contract by administrative fiat.
Suggesting to its managers that the City give 30 days' notice, where the union contract provides for 20, makes sense, as by doing so some glitches in giving notice can be avoided or corrected.{**3 Misc 3d at 558}[FN3]

To convert an internal directive to "err on the safe side" to a mandate for additional time, would either continue to expand notice times, or require all notices to be technically perfect as to timing, each an absurd result.
Thus, from a functional analysis, DC-37's claim that the Layoff Manual creates additional notice requirements fails. The absence of precedent is not surprising and reinforces this result. As the separation of municipal employees begets sharply contested litigation, almost as night follows day, the absence of cases on this issue suggests that in the past no one considered the Layoff Manual binding on the City. While the fact that an issue hasn't been raised before is not conclusive, in the context of this litigation, it seems to be a last gasp issue. The City gave at least 20 days' notice, as it was required under the union contract. Even if the first notices were not fully compliant with the contract, DC-37 had all the information it had bargained for in a reasonable form for more than 20 days as required by the union contract.
DC-37's request for a declaration that the City has violated the Layoff Manual, or the time limits therein is therefore denied, and that accordingly, the City's cross motion to dismiss the petition on the grounds that it fails to state a cause of action is granted with respect to these grounds.

The WEP Employees

A second contention in this proceeding relates to the WEP program.
The WEP program is an outgrowth of welfare reform legislation and programs on both the federal and state levels enacted during the 1990's. That legislation required welfare recipients who were capable of work to engage in certain minimum work related activities as a condition of continuing [*6]to receive their benefits.
The WEP program, which contemplated that these work requirements could be fulfilled in part by employment in the public sector, was created as a result of these statutory changes. The federal law (the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, commonly known as the Clinton Welfare Reform Act) reflected the political problem of replacing {**3 Misc 3d at 559}regular governmental employees by welfare workers by including "antidisplacement provisions." These provisions state:
"No adult in a work activity . . . which is funded, in whole or in part, by funds provided by the Federal Government shall be employed or assigned
"(A) when any other individual is on layoff from the same or any substantially equivalent job; or
"(B) if the employer has terminated the employment of any regular employee or otherwise caused an involuntary reduction of its workforce in order to fill the vacancy so created." (42 USC § 607 [f] [2].)
To implement these provisions, New York adopted Social Services Law § 336-c (2) (e) to achieve the same end. Such section permits the assignment of a WEP worker only where:
"(e) such assignment [of a WEP worker] would not result in (i) the displacement of any currently employed worker or loss of position (including partial displacement such as reduction in the hours of non-overtime work, wages or employment benefits) or result in the impairment of existing contract for services or collective bargaining agreements; (ii) the employment or assignment of a participant or the filling of a position when any other person is on layoff from the same or any equivalent position or the employer has terminated the employment of any regular employee or otherwise reduced its workforce with the effect of filling the vacancy so created with a participant assigned pursuant to this section; (iii) any infringement of the promotional opportunities of any current employed person; or (iv) the performance, by such participant, of a substantial portion of the work ordinarily and actually performed by regular employees; or (v) the loss of a bargaining unit position as a result of work experience participants performing, in part or in whole, the work normally performed by the employee in such position." (Emphasis added.)
These rules were created in acts of cognitive dissonance by the Congress and the State Legislature to placate competing constituencies. However, they act as the legal framework which it is now this court's duty to apply in this proceeding. Thus, the court must determine how a welfare worker is to be given meaningful work in a City job where giving him such work cannot affect the jobs or promotion of a civil servant or the work assigned to such civil servant.
These seemingly inconsistent mandates have been the basis for much dispute and litigation over what work a WEP worker can {**3 Misc 3d at 560}do and how WEP workers interface with the remainder of the regular work force, both at the time of hiring and firing. What seems to be the resolution is that WEP workers may be hired to perform functions which are not being performed by ordinary employees. The exact configuration of the duties and limits of deployment of WEP workers at DOE, however, need not be ascertained in order to render a decision in this proceeding. Prior to the [*7]separation of the employees, WEP workers were in place in DOE performing certain clerical functions. Roberts I, which raises this issue, does not challenge the employment of such WEP workers prior to the time of dismissal of the employees but seeks to reverse their separation on the grounds that the WEP workers will or may be assigned to the work performed by the separated workers. While such assignments, if actually made, may raise issues of the City's violation of Social Services Law § 336-c (2) (e), such issues are not relevant to the separation of the employees, as the remedy for a violation of section 336-c (2) (e) would be to remove the WEP workers from the improper assignment, not to mandate the rehiring of the employees. As there is no showing that the functions performed by the employees are mandated by law and cannot be performed by other permanent City employees, the City may elect not to perform the tasks performed by the separated workers. If the City, in its discretion, wants such tasks to be performed, it may have to rehire some or all of the employees or other non-WEP workers, in a manner otherwise required or permitted by law.
Accordingly, although section 336-c (2) (e) remains applicable to City employment of WEP workers and may be enforced to carry out its purposes, section 336-c (2) (e) does not provide a basis for granting DC-37 the relief sought in Roberts I, i.e., the rescission of the separation of the employees. The appropriate remedy would be to commence an article 78 proceeding for declaratory and injunctive relief, identifying the specific WEP participant's whose assignments have violated the provisions of section 336-c (2) (e). (See Rosenthal v City of New York, 283 AD2d 156 [1st Dept 2001], on remand Rosenthal v City of New York, Sup Ct, NY County, Nov. 26, 2003, Stallman, J., Index No. 103750/99.)
Thus, DC-37's prayer for relief on the grounds that the City violated section 336-c (2) (e) per se, by reducing the work force of DOE while retaining WEP employees, is denied. DC-37's other prayers for relief relating to the WEP workers, which speculate, assume, or allege violations of section 336-c (2) (e){**3 Misc 3d at 561} are likewise denied, but for the reason that there has been no showing of a particular violation beyond such generic allegations. This denial is without prejudice to DC-37 to assert such claims under such proceedings and with such proof as required by Rosenthal (supra).

Contracting Out

In its petition in Roberts I, DC-37 also requests relief because the City contracted out work. The relief sought is a declaration that the City has acted arbitrarily and capriciously and in violation of New York Constitution, article V, § 6 in contracting out work "while laying off DOE civil service employees is the same or comparable jobs," and an injunction to enjoin the City "from laying off Civil Service employees while contract workers perform the same or comparable work" and to enjoin the City "from using contract workers to perform the same or comparable work in place of employees represented by" DC-37.
Contracting out has been a major issue of political debate in this city, state and country in both the public and private sector. It is part of the perennial clash between purchasers of goods and services (including taxpayers) who seek better prices and lower costs and purveyors of such goods and services who equally seek to protect their income and identity as the purveyor of choice. It is part of the continuing clash of economic interests, as translated by those interests, from time to time to slogans and political action leading sometimes to law and regulations to regulate the parameters under which these competing forces operate where "contracting out" impacts on employment. These laws and regulations are those which this court must apply to this case. Fixing these parameters by law are the continued concern of the political bodies of the city, state and federal governments, [*8]who from time to time set rules within their respective spheres of jurisdiction. Employees, either individually or collectively, often also address these concerns by contract. Absent such contracts, laws or regulations, there is no restriction on how an enterprise or a municipality need structure its staff or production facilities in deciding how to accomplish its ends in an effective or economic manner. Thus, this court may neither determine whether contracting out is good nor bad, but must determine whether DC-37 has established that the City has acted improperly in violation of some law, regulation or contract in "contracting out."
An initial DC-37 contention is that certain work was "contracted out" prior to the separations, and that such work could be {**3 Misc 3d at 562}performed by the separated employees, and, therefore, the "contracted out" work should be reassigned to the separated employees and those performing the "contracted out" work should be let go, so that the same cost reductions could be achieved to meet the City's financial needs.
Before considering such contention, it is necessary to further analyze what "contracting out" means. "Contracting out" is often used as a pejorative by those adversely affected to characterize a change in the performance of a function by a government or private enterprise when performance of a function is to be done by some other entity for a payment, instead of the organization's own workers. It is as simple as the decision of a housewife to buy rather than to make bread, or as complex as the decision by a corporation to outsource its data processing system. Modern organizations often find it advisable to have functions formerly performed by them performed by others to keep pace with technology or changing market challenges. Conversely, many modern organizations, where appropriate, deciding to bring "contracted out" functions "in house," such as where a house counsel is hired to replace an outside attorney or where a "captive" travel agency or insurer is established with the organization's own employees performing such tasks rather than using an independent travel agent or insurance company.
Thus, "contracting out" is neither an evil nor a panacea but is a management tool to be used where appropriate to enable an organization to best fulfil its function. There is similarly no inherent (other than political) objection to contracting out most functions by a municipality, to enable municipal managers to carry out municipal functions and goals in a proper and efficient manner. Further, contracting out does not necessarily mean that the performance of certain governmental functions are to be performed by the private sector. Many municipal governments contract municipal functions out to other municipalities, including such core governmental functions as fire and police protection and education, such as where one school district pays tuition to another for certain types of extraordinary services so that each district need not replace the facilities to educate such students. "Contracting out" of municipal functions to the private sector, of course, carries more emotional political baggage, especially to municipal unions. However, examples across the country where such "core" functions as sanitation, water supply, hospitals and prisons have been "{**3 Misc 3d at 563}privatized" show the extent of possibilities. The wisdom and efficacy of such contracting out is a matter for political discourse and decision and not a matter for the courts to decide.
The limit to the City's freedom to "contract out" must, if it exists, therefore be found either in law or in a contractual impediment. Only if DC-37 can establish one may this court consider their contentions relating to contracting out in this proceeding.
DC-37 cites, inter alia, in support of its position, New York Constitution, article V, § 6, which states:[*9]"Appointments and promotions in the civil service of . . . cites . . . shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive." 
Such section relates to persons who are or will be employees of the City and not to functions to be performed by an independent contractor through its own employees. Under DC-37's contention, if the City, which formerly had its own employees bake bread for use in its schools, prisons and hospitals, decided to buy bread from a manufacturer, the manufacturer's employees would be subject to this constitutional mandate. The purpose of New York Constitution, article V, § 6 was to prevent the appointment of persons to or their advancement in civil service through patronage or improper favor. Where a municipality contracts with another for goods or services, formal procurement proceeding and competitive bidding compensates to protect the public from similar patronage excesses. Section 6 does not apply to independent contractors or their employees.
The record does not show that the contracts under which the contract workers referenced by the union to perform services were not properly let to independent contractors or that the persons performing the functions thereunder are civil servants.
It is again illuminating that in its submission DC-37 cites no cases to support its position on this issue, especially given the continuing public debate over contracting out. DC-37 also points to no provisions of the union contract under which the City is constrained from contracting out the functions complained of. Without any such authority, this court cannot set aside what is essentially a managerial decision of the City. DC-37's white paper itself reinforces this analysis. The white paper, by focusing on the relative efficiencies of how work could be performed by civil service employees reinforces the analysis that "contracting out" is an ongoing process, together with its opposite, "vertical{**3 Misc 3d at 564} integration," by which City managers make choices as to how to perform work in an effective and efficient manner. That the white paper represents one argument by an interested party, neither makes it wrong nor right in its content or conclusion. Resolving the ongoing argument in this area, however, is not for the court. It is a matter between the City, its managers and its constituencies to be determined by the managers, in the exercise of their managerial judgment, as it may be impacted by the City's contractual agreements with its unions and by legal rules properly established through the political process.
Accordingly, DC-37's request for a declaration that contracting out is arbitrary and capricious and in violation of the State Constitution, while employees are being laid off, is denied as is DC-37's request for an injunction to prevent layoffs while "contract workers" perform similar or comparable work, or from using "contract workers" to perform such work.

The Rights of Provisional Employees

The final issue present in Roberts II relates to the rights of provisional employees and whether, in an economic downturn, they may be terminated, and in such event, whether there is any order in which they must be separated.
Here, the union asserts that some of the employees had already passed a competitive examination for their positions (although none had at that time been appointed from the list [*10]generated for such exam).[FN4]

Those workers, the union asserts, could not be properly separated at a time that other provisional workers who had not passed the exam were retained in their position as provisional employees. This, contends the union, was an arbitrary and capricious act of DOE reviewable under CPLR article 78. When Roberts II was commenced in March 2003, a significant number of additional provisional employees in the general categories of positions held by the employees in January 2003, remained employed by the City. However, the City responded, in late March, that it expected that all of these still employed provisionals would be separated shortly, subject to revision.
The City has countered with a number of arguments. One is dispositive of DC-37's claims, and requires dismissal of Roberts II. The City in response states that, subject to revision,{**3 Misc 3d at 565} it will separate the remainder of the provisional employees in the relevant category. The union's counter is that in fact, all may not be separated, conceding that most would be.
While there the union has submitted some cases finding that the separation of provisional employees may not be carried out in an arbitrary and capricious manner, under the record here, no showing of any arbitrary or capricious acts can be established. The reduction in force at DOE by the separation of provisional employees performing administrative functions to meet budgetary constraints, rather than reducing the pedagogical staff is hardly arbitrary or capricious. The fact that all or almost all provisional employees are being laid off in separate traunches, pursuant to a plan, is hardly arbitrary or capricious.
Until the dust has settled in this round of separations, it is not possible to predict nor are facts available to show that any of the remaining provisionals not separated will be ones who have not passed the competitive exam or that the action of the City will be arbitrary or capricious. The court cannot, on the record, find any basis to assume any of these speculative negative facts. Accordingly, DC-37 cannot sustain its right to article 78 relief under Roberts II. Absent such a showing, the court must uphold the City's response that DC-37 cannot, in Roberts II, state a cause of action.
For the reasons set forth above, DC-37 petitions in both Roberts I and Roberts II must be and are hereby dismissed. Accordingly, the City's cross motions to dismiss each proceeding are effectively granted.

Footnotes

Footnote 1: There were other DOE employees separated at that time who were not represented by DC-37. The separation of such other employees is not challenged in these proceedings.

Footnote 2: The rubric on which these cases proceed is that loss of employment does not constitute "irreparable damage" for the purpose of meeting the criteria for the issuance of a preliminary injunction because, if the court eventually finds that termination was improper, the loss may be compensated by money damages for back pay. (See, e.g. Cohen v Department of Social Servs., 30 NY2d 571, 572 [1972]; Hill v Reynolds, 187 AD2d 299 [1st Dept 1992]; see also Valentine v Schembri, 212 AD2d 371 [1st Dept 1995]; Suffolk County Assn. of Mun. Empls. v County of Suffolk, 163 AD2d 469, 470 [2d Dept 1990]; Matter of Armitage v Carey, 49 AD2d 496 [3d Dept 1975].)

Footnote 3: As for example, where notices are prepared by a manager then sent to the mail room which fails to mail them until the next day because someone has left early because of an illness, or where the person counting the required number of days has forgotten that some months have less then 31 days.

Footnote 4: The record does not show how many of the 303 fall into this category. As the City has not disputed that "some" exist, the court will, for the purpose of this proceeding, assume that "some" exist.